## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JAMES COOPER, EXECUTOR | : | |
| OF THE ESTATE OF JAMES C. | : | |
| CARTER, | : | CIVIL ACTION NO. |
| Plaintiff, | : | 3:07-CV-823 (JCH) |
| | : | |
| v. | : | |
| | : | |
| CITY OF HARTFORD, ET AL. | : | JULY 21, 2009 |
| Defendants. | : | |
| | : | |

### RULING RE: DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT (Doc. No. 50)

Plaintiff James Cooper, Executor of the Estate of James C. Carter ("Cooper"), brings this action against the City of Hartford ("City"), Chief Patrick J. Harnett, in his official and individual capacity, and Steven Miele, Shaun St. John, Victor Otero, and Jeffrey Hopkins, in their individual capacities (together, "defendant police officers").[1]  In Count One, Cooper alleges that Carter was deprived of his rights under the Fourth and Fourteenth Amendments to the United States Constitution, in violation of 42 U.S.C. § 1983.  In Count Two, Cooper alleges that Carter was deprived of his rights under Article first, sections 7 and 9 of the Connecticut Constitution.  In both Counts, Cooper alleges that the defendant police officers deprived Carter of his right to be free from unreasonable searches and seizures, false arrest, and the use of excessive force; that the defendant police officers denied or unreasonably delayed Carter's ability to obtain

---

[1]The plaintiff's brief does not address the capacity in which the defendants are sued, and the Complaint is somewhat ambiguous on the question.  Compare Compl. at ¶ 2 (all individual defendants sued in their official and individual capacities), with id. at ¶¶ 9-13 (Harnett sued in his individual and official capacity, others are sued in their individual capacities only), and id. at caption (same).  The court will accept the more specific language of ¶ 9-13 and the caption as controlling.

lifesaving medical treatment; that the City and Harnett had in effect de facto policies, practices, and customs that exhibited deliberate indifference to the constitutional rights of citizens and residents of Hartford; and that the City and Harnett failed to properly investigate Carter's and similar claims of misconduct, exhibiting deliberate indifference to the constitutional rights of citizens and residents of Hartford.[2]  In Count Three, Cooper alleges that defendant police officers wrongfully caused Carter's death, are liable for their conduct, and that the City is also liable for the negligent acts and omissions of the police officers.  In Count Four, Cooper alleges that the defendant police officers engaged in negligent conduct that caused Carter emotional distress.  In Count Seven,[3] Cooper seeks indemnification from the City for any damages recovered from defendant police officers as to all Counts.  Pending before the court is defendants' Joint Motion for Summary Judgment (Doc. No. 50).  For the reasons that follow, defendants' Motion is GRANTED in Part and DENIED in Part.

---

[2]In his Memorandum in Opposition to defendants' Joint Motion for Summary Judgment, Cooper abandons his failure to supervise allegations against Harnett. Opp'n at 46 n.5, 50.  Cooper consents to the granting of summary judgment as to Harnett, id., conceding that the record does not evidence the personal involvement of Harnett as would be necessary to hold him liable.  See Farrell v. Burke, 449 F.3d 470, 484 (2d Cir. 2006) (quoting Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994)) ("It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.").  The court will therefore GRANT summary judgment as to claims against Harnett in Counts One and Two (Counts Three, Four, and Seven are not brought against Harnett), and will not further consider these claims.

[3]The Complaint does not contain a Count Five or Count Six.

## I.    FACTUAL BACKGROUND[4]

In the late evening of May 14, 2005, Sergeant Steven Miele and Officers Shaun St. John, Jeffrey Hopkins, and Victor Otero ("defendant police officers" or "officers") were assigned to a four-officer "Disorder Control Team Detail" in Hartford, Connecticut. Defendants' Joint Local Rule 56(a)(1) Statement, at ¶ 2 (hereinafter "Defs.' 56(a)(1)").[5]

At approximately 10:35 p.m. that same evening, Tara Wilson, a resident of Hartford, left her home in her car, heading for her sister's house.  Affidavit of Tara Wilson, Pl.'s Ex. 7, at ¶¶ 2-4 (hereinafter "Wilson Aff.").  Wilson drove a dark-colored Pontiac Bonneville.  Id. ¶ 5.  She had traveled only about 0.3 miles, to the vicinity of 161 Martin Street in Hartford, when she encountered heavy pedestrian traffic.  Id. ¶¶ 1, 6-8; Google Map, Pl.'s Ex. 14 (hereinafter "Google Map").  Neighborhood residents soon placed James Carter, who had just been shot several times, in the back of her vehicle, and Carter's girlfriend got in the passenger seat of her vehicle.  Wilson Aff. at ¶¶ 10-13. Wilson was told to drive to the hospital, and began to drive at a high rate of speed towards St. Francis Hospital, about 2.1 miles away.  Id. ¶¶ 14-15; Google Map.  She drove southbound on Martin Street, cut over one block to Garden Street, and continued southbound.  Wilson Aff. at ¶¶ 15-17; Google Map.

At around the same time, the Hartford Police Department responded to reports of shots fired at 161 Martin Street in Hartford.  Defs.' 56(a)(1) at ¶¶ 3-4; Police Reports, Def.'s Ex. 6; Wilson Aff. at ¶¶ 1-22.  Officer Lollar, while responding to the scene,

---

[4]For the purposes of the instant motion, the court accepts facts undisputed by the parties as true and resolves disputed facts in favor of the plaintiff where there is evidence to support his allegations.

[5]When the court cites a section of the Defendants' Joint Local Rule 56(a)(1) Statement that has been denied by the plaintiff, the court is citing only the uncontested portion of that statement.

observed a black-colored Pontiac Bonneville traveling southbound on Martin Street away from the vicinity of the shooting.  Report of Officer Lollar, Def.'s Ex. 6, at 21. Officer Lollar informed the dispatcher, who relayed the description of a "dark-colored" vehicle fleeing the area that may have contained shooters or a victim.  Defs.' 56(a)(1) at ¶¶ 6-7; Deposition of Jeffrey Hopkins, Def.'s Ex. G, at 19-20 (hereinafter "Hopkins Dep."); Deposition of Stephen Miele, Def.'s Ex. I, at 17-19 (hereinafter "Miele Dep."); Deposition of Shawn St. John, Def.'s Ex. H, at 11-12, 15-16 (hereinafter "St. John Dep.").  Defendant police officers (Miele, St. John, Hopkins, and Otero) observed a vehicle that they believed to be similar to the description of the vehicle described on the radio traveling southbound at a high rate of speed on Garden Street.  Hopkins Dep. at 19-20; Miele Dep. at 17-19; St. John Dep. at 11-12, 15-16.  Defendant police officers activated their police cruiser's lights and sirens and pulled the Bonneville over at the corner of Garden Street and Mather Street.  Defs.' 56(a)(1) at ¶ 9.  At the time she was pulled over, Wilson had traveled about 0.8 miles from the scene of the shooting, and remained about 1.3 miles from St. Francis Hospital.  Id.; Google Map.

As the officers approached the vehicle, the driver, Tara Wilson, exited the vehicle and immediately informed the officers that the back seat passenger had been shot and that she was trying to bring him to the hospital.  Defs.' 56(a)(1) at ¶ 11; Wilson Aff. at ¶ 25.  The officers approached the backseat of the vehicle with their guns drawn. Id. ¶ 27.  Upon opening the back door, they immediately observed that Carter was bleeding and injured, laying down in the back seat.  St. John Dep. at 13-14. Carter asked the defendant police officers to take him to the hospital.  Id.  The police officers called for gloves and did not touch Carter until another cruiser arrived and supplied blue

4

gloves to the officers.  Wilson Aff. at ¶¶ 33-34; St. John Dep. at 31-32.   They put on the

blue gloves, and began grabbing at Mr. Carter and yelling for him to, "Sit the fuck up."

Wilson Aff. at ¶ 35.  One or more officers grabbed him by the chest and pulled him

upright, while others grabbed his legs and pushed them to the floor.   Wilson Aff. at ¶¶

36-37.  Carter then tried to get out of the vehicle, but the officers restrained him and a

struggle ensued.  Wilson Aff. at ¶ 39.  They then forcibly removed Carter from the rear

seat of the vehicle. Miele Dep. at 29-31, 56, 59; St. John Dep. at 14.

        After the officers removed Carter from the vehicle, one or more officers called for

an ambulance, at approximately 11:00 p.m.  Hopkins Dep. at 27-28; EMS Hartbeat

Dispatch Summary Record, Pl.'s Ex. 9 (hereinafter "EMS Record").  Defendant police

officers attempted to administer first aid to him, but Carter resisted.  Hopkins Dep. at

32-35, Miele Dep. at 25-26 ; St. John Dep. at 33-34.  Carter told the officers that he

wanted to leave to go to the hospital, and he attempted to leave.  Hopkins Dep. at 33-

34; St. John Dep. at 34; Miele Dep. at 23.  The officers physically restrained him,

forcing him to remain at the corner of Garden and Mather Streets pending the arrival of

the ambulance, and holding him to the ground to enforce compliance with their orders.

Hopkins Dep. at 32-24; St. John Dep. at 15, 21-23.  They did not, however, handcuff

him.  Defs.' 56(a)(1) at ¶¶ 24, 31.  The officers prevented Carter from leaving the scene

despite his verbal requests to leave, to not be detained, and to continue on the way to

the hospital.  Hopkins Dep. at 32-34; St. John Dep. at 15, 21-23, 34; Miele Dep. at 23,

70-72.  The defendant police officers subjectively believed that they lacked probable

cause to suspect Carter of a crime.  Hopkins Dep. at 22-23, 27, 38; Miele Dep. at 26-

27; St. John Dep. at 15-16, 33.

The Hartford Police Department has a written policy providing that sick or injured individuals shall be transported to the hospital by ambulance except in exigent circumstances, when the policy contemplates such an individual being transported by police cruiser.  Hartford Police Department Policy and Procedure 7-17: Emergency Medical Services, Oct. 6, 1982, Def.'s Ex. 2.  Separately, the policy also provides that the assigned ambulance will transport the patient unless conditions exist which would jeopardize human life.  Id.  The defendant police officers, like all Hartford officers, received First Aid, CPR, and "MRT" training.  Defs.' 56(a)(1) at ¶¶ 22-23.  In spite of the written policy providing for transport of injured individuals by police cruiser in exigent circumstances, the defendant police officers followed an unwritten practice of the Hartford Police Department of only transporting sick or injured individuals to the hospital by ambulance.  Miele Dep. at 41-43; St. John Dep. at 22-26.  On the night in question, the officers were aware that ambulance response might be delayed because there was another shooting that night and they were awaiting the arrival of an ambulance from the location of that shooting.  Wilson Aff. at ¶ 42.  The officers nevertheless refused to transport Carter to the hospital in their police cruiser.  Miele Dep. at 41-43; St. John Dep. at 22-26.  In doing so, they followed orders from Miele, the sergeant in charge at the scene.  St. John Dep. at 22-23.

At 11:02 p.m., the Fire Department arrived and took control of Carter's emergency medical needs.  Defs.' 56(a)(1) at ¶ 25.  At 11:05 p.m., the first ambulance, American Medical Response ("AMR") Unit 903 arrived.  Id. ¶ 26.  At 11:06 p.m., AMR Units 915 and 917 arrived.  Id. ¶ 27.  The AMR units applied a backboard and provided emergency medical treatment.  Id. ¶ 28.  They began to address Carter's injuries at the

6

scene.  Id. ¶¶ 28-30   At 11:21 p.m., the ambulance carrying Carter departed the scene, arriving at St. Francis Hospital at 11:22 p.m.  EMS Record.

Prior to Wilson's car being pulled over, Carter was engaged, alert, and talking. Wilson Aff. ¶¶ 18, 23-24.  He continued to have signs of life as he first interacted with the officers, but his condition progressively worsened.  Id. ¶ 41.  By the time he reached the hospital, he had lost consciousness and stopped breathing.  Operative Report, Pl.'s Ex. 17.  He died of his gunshot wounds while at the hospital.  Id.

The Office of the Chief Medical Examiner of the State of Connecticut performed an autopsy on Carter and determined that the cause of death was "multiple gun shot wounds," and the manner of death was "homicide."  Report of Ira J. Kanfer, Associate Medical Examiner, Def.'s Ex. D.  This information was recorded on Carter's death certificate.  Death Certificate of James Curtis Carter, Def.'s Ex. E.  Dr. Peter J. Paganussi, plaintiff's expert, issued a report opining to a reasonable medical certainty that, although the shooting caused Carter's death, Carter was deprived of the opportunity for successful treatment as a result of the delay in transporting Carter to the hospital.  Report of Dr. Peter J. Paganussi, Pl.'s Ex. 8 (hereinafter "Paganussi Rep.").

Cooper filed a written complaint with the Hartford Police Department's Internal Affairs Division contending that the officers had engaged in misconduct.  Defs.' 56(a)(1) at ¶ 38.  An investigation by Internal Affairs concluded that complaints against the officers were unfounded, meaning that "[t]he investigation indicates that the act or acts complained of did not occur or failed to involve police personnel."  Investigative Report, Def.'s Ex. 5.

## II.    STANDARD OF REVIEW

In a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); White v. ABCO Engineering Corp., 221 F.3d 293, 300 (2d Cir. 2000).

Once the moving party has met its burden, in order to defeat the motion the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," Anderson, 477 U.S. at 255, and present such evidence as would allow a factfinder to find in her favor, Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).

When assessing the record, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought. Anderson, 477 U.S. at 255; Graham, 230 F.3d at 38.  "This remedy that precludes a trial is properly granted only when no rational finder of fact could find in favor of the non-moving party."  Carlton v. Mystic Transp., Inc., 202 F.3d 129, 134 (2d Cir. 2000). "When reasonable persons, applying the proper legal standards, could differ in their responses to the question" raised on the basis of the evidence presented, the question must be left to the factfinder.  Sologub v. City of New York, 202 F.3d 175, 178 (2d Cir. 2000).

## III.    ANALYSIS

### A.    Count One: Claims Against Defendant Police Officers

In Count One, Cooper alleges that the defendant police officers violated Carter's constitutional rights.  Count One targets several different actions undertaken by

defendants.  The court will evaluate these actions separately according to the relevant constitutional standards.

    1.  Qualified Immunity: Initial Inquiry

  Defendant police officers have contended that, even if the court concludes that the facts viewed in the light most favorable to the plaintiff show that they violated Carter's constitutional rights, that they are entitled to qualified immunity.  "Qualified immunity protects officials from liability for civil damages as long as 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  Gilles v. Repicky, 511 F.3d 239, 243 (2d Cir. 2007) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  The Second Circuit has explained the procedure courts are to follow in addressing qualified immunity:

> When a defendant officer charged with violations of federal constitutional rights invokes qualified immunity to support a motion for summary judgment, a court must first consider a threshold question: Do the facts, viewed in the light most favorable to the plaintiff, show that the officer's conduct violated a constitutional right?  If the facts, viewed in that light, do not establish a violation of a constitutional right, there is no necessity for further inquiries concerning qualified immunity, and the officer is entitled to summary judgment.

Walczyk v. Rio, 496 F.3d 139, 154 (2d Cir. 2007) (citations and internal quotation marks omitted).  The court will therefore first turn to the question of whether the facts establish the violation of a constitutional right.   If they do, the court will proceed to the second part of the inquiry—whether the right was clearly established.  Gilles, 511 F.3d at 244.

    2.  Unreasonable Seizure and False Arrest

  The Fourth Amendment to the United States Constitution states that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  The Fourteenth

Amendment extends the protections of the Fourth Amendment to searches and

seizures by state and local officers, such as the defendant police officers.  See Elkins v.

United States, 364 U.S. 206, 213 (1960).  A traffic stop, however brief or limited,

"constitutes a seizure for Fourth Amendment purposes, and thus must not be

unreasonable."  Gilles v. Repicky, 511 F.3d 239, 244-45 (2d Cir. 2007) (citing Whren v.

United States, 517 U.S. 806, 809-10 (1996)).  When a police officer makes a traffic

stop, the driver and passengers are both seized within the meaning of the Fourth

Amendment.  Brendlin v. California, 127 S. Ct. 2400, 2403 (2007).

It is undisputed that the vehicle in which Carter was riding was subject to a traffic

stop by the defendant police officers.  Carter was seized and has standing to challenge

the stop.   The court must therefore determine whether stop was objectively

reasonable:

> The Fourth Amendment requires that an officer making [a traffic] stop have
> probable cause or reasonable suspicion that the person stopped has committed
> a traffic violation or is otherwise engaged in or about to be engaged in criminal
> activity.  Whether probable cause or reasonable suspicion exists is an objective
> inquiry; the actual motivations of the individual officers involved in the stop play
> no role in the analysis.

Holeman v. City of New London, 425 F.3d 184, 189-90 (2d Cir. 2005) (citations and

internal quotation marks omitted).  Further, "[t]he constitutional validity of a stop is not

undermined simply because the officers who made the stop were mistaken about

relevant facts."  United States v. Jenkins, 452 F.3d 207, 212 (2d Cir. 2006).

Cooper contends that the defendant police officers lacked reasonable suspicion

or probable cause to stop Wilson's vehicle, so that the initial seizure and any

subsequent further seizure violated Carter's Fourth Amendment rights.  He also argues

that, even if there was reasonable suspicion to initially stop the vehicle, any such suspicion quickly dissipated, and the stop therefore lasted longer than was necessary to effectuate its purpose.  The defendant police officers counter that the stop was lawful because there is no issue of fact as to whether the officers reasonably believed that the driver, Carter, or the other passenger in the car were armed and dangerous and posed a danger to the officers.  They also contend that there is no issue of fact as to whether the officers acted reasonably in not prolonging the stop.  The court will separately consider the initial decision to stop the vehicle, Carter's removal from the vehicle, and whether the stop was unduly prolonged.

a.    Initial Traffic Stop of Wilson's Vehicle

When the defendant police officers stopped Wilson's vehicle, it is undisputed that they acted in response to Officer Lollar's radio report that a dark-colored vehicle, possibly containing a suspect or victim, was traveling southbound on Martin Street away from the vicinity of the shooting.  This report, which followed almost immediately on the heels of the initial radio report that shots had been fired, was called in by one of the initial officers to respond to the scene.  By the time the officers encountered Wilson's vehicle, it was on Garden Street, one block west of Martin Street, and approximately 0.8 miles from the scene of the shooting.  The radio report identified neither the specific color of the vehicle (referring to it as "dark") nor the specific make.  Nevertheless, when the officers encountered Wilson's vehicle shortly after hearing the description on the radio, they believed it to be a match.

The court must determine whether the defendant police officers had probable cause or reasonable suspicion that either Wilson or Carter had committed "a traffic

11

violation or [were] otherwise engaged in or about to be engaged in criminal activity."
Holeman, 425 F.3d at 189-90 (citations omitted).  Courts reviewing the reasonableness
of a stop "must look at the totality of the circumstances of each case to see whether the
detaining officer has a particularized and objective basis for suspecting legal
wrongdoing."  United States v. Arvizu, 534 U.S. 266, 273 (2002) (internal citations and
quotation marks omitted).  The court should not analyze each fact separately, nor need
it find that any single factor provides reasonable suspicion on its own.  Id. Instead, it
must engage in a totality of the circumstances inquiry, which accounts for the fact that
officers "draw on their own experience and specialized training to make inferences from
and deductions about the cumulative information available to them that might well elude
an untrained person."  Id. at 273-74 (citations and internal quotation marks omitted).

In several recent cases, the Second Circuit has addressed the existence of
reasonable suspicion in similar circumstances to those of this case.  In the recent case
of United States v. Lucky, the Second Circuit considered whether the police had
reasonable suspicion to conduct an investigatory stop on a vehicle that had reportedly
been used in a shooting two days earlier.  569 F.3d 101, 103 (2d Cir. 2009).  The
description of the vehicle and the license plate number matched the report, and the
vehicle was encountered in the vicinity of where the shooting had taken place.  Id. at
103, 106.  The description of the shooter's height in the report did not match that of the
driver of the vehicle, but the court nevertheless found reasonable suspicion, reasoning
that the officers did not recall the height of the shooter from the report, that the driver's
height was not apparent while he remained inside the car, and that "there was
reasonable suspicion at least to speak briefly with whoever was driving a car that had

12

just been used in a shooting, even if it had been clear that the driver had not been the shooter."  Id. at 106.

In United States v. Vashja, the court found reasonable suspicion where officers responding to a call of "either shots fired or a man with a gun" encountered a man across the street who then grabbed his waistband, walked swiftly away from the police car, and then pretended to smoke an unlit cigarette.  282 Fed. Appx. 942, 943-44 (2d Cir. 2008) (summary order).  In Holeman v. City of New London, at around 4:30 am, an officer was investigating a "prowler call" and "followed a car with tinted windows that took a circuitous route through a troubled neighborhood."  425 F.3d at 188.  The car hesitated and stopped at a stop sign, followed a route it had already traveled once before, was registered in a neighboring city, and was spotted in a high crime neighborhood.  Id. at 190.  The court found that the officer was entitled to qualified immunity,[6] based on an objectively reasonable belief that there was reasonable suspicion based upon these facts and also that the fact that the officer was investigating a prowler call, he saw no other vehicle on the road, and the car had tinted windows that obstructed his view into the car.  Id. at 190-91.

With this precedent in mind, the court concludes that there are issues of fact as to whether the officers had reasonable suspicion to stop the vehicle.  First, Officer Lollar had very limited information about the vehicle and its passengers.  He knew that a dark Pontiac Bonneville was traveling from a vicinity where shots had been reported fired,

---

[6]Because Holeman was an interlocutory appeal from a denial of qualified immunity, the court decided the qualified immunity issue without first rendering a judgment on whether or not reasonable suspicion existed.  425 F.3d at 190-91.

but he did not know whether the vehicle contained a shooter, victim, or unrelated

persons that happened to be passing through the area of the shooting.  See Hopkins

Dep. at 19-20; Miele Dep. at 17-19; St. John Dep. at 11-12, 15-16.  Second, the

information relayed by the dispatcher and possessed by the defendant police

officers—that a dark car[7] was traveling southbound away from the scene, and that it

might contain a shooter or a victim—inherited the flaws of the original report.  Unlike the

vehicle in Lucky, Officer Lollar's report did not link the vehicle in the instant case directly

to the shooter or shooting, nor was a license plate number or other clear identifying

information provided.  Nor, in contrast to the facts of Vashja or Holeman, did an officer

observe the occupants of the vehicle in this case engaged in suspicious behavior.  In

fact, the officers did not know anything about the occupants of the vehicle or even

whether they were actually related to the shooting.

Third, even if Officer Lollar might have had reasonable suspicion to stop the

vehicle based upon encountering it in the immediate vicinity of the shooting, the inquiry

cannot stop there.  If the officers did not reasonably believe that they had encountered

the same vehicle referred to in the radio report, then there would be no reasonable

suspicion to stop the vehicle.

The defendant officers encountered the vehicle neither at the scene nor on

Martin Street, but on a parallel street one block west and about 0.8 miles south of the

shooting scene.  Several factors weigh in favor of the conclusion that the officers

---

[7]Although some evidence in the record suggests that the car was identified as a dark-colored
Bonneville, viewing the facts in the light most favorable to the plaintiff, the radio report did not identify the
car as a Bonneville.

reasonably believed that they had encountered the same vehicle referred to in the radio report.  Martin Street, on which the shooting took place, continues south for only three blocks past the scene of the shooting before dead-ending at Spring Grove Cemetery; it could be expected that a car originally spotted traveling southbound on Martin Street might cut over one block to Garden Street in order to continue heading southward.  See Google Map, Pl.'s Ex. 14.  Similarly, it could also be expected that the car would have traveled just under a mile in the couple of minutes between the initial radio report and when the vehicle was stopped.

In addition, the vehicle was traveling at a high rate of speed.  Even if the vehicle was not violating any traffic laws, this factor weighs in favor of a finding of reasonable suspicion.[8]  Finally, the officers were responding to a report of shots fired and a rapidly unfolding situation, in which they are entitled to greater leeway to act decisively than if they are afforded more time to analyze the situation and check facts.

Nevertheless, the totality of the circumstances, viewed in the light most favorable to the plaintiff, did not provide the officers with a particularized and objective basis for suspecting that the occupants of Wilson's vehicle were engaged in criminal activity.  It is unlikely that Officer Lollar, based on his limited knowledge, had reasonable suspicion to stop the vehicle at the time that he first encountered it.  By the time the defendant

---

[8]Standing alone, reasonable suspicion that the operator of a motor vehicle has committed a traffic violation can provide justification for a motor vehicle stop.  United States v. Stewart, 551 F.3d 187, 193 (2d Cir. 2009).  However, although defendant police officers testified in their depositions that the vehicle was traveling at a high rate of speed when they pulled it over, they have not asserted that the vehicle's speed alone provided reasonable suspicion that Wilson had committed a traffic violation.  See Hopkins Dep. at 20 ("Pass us going southbound at what one would consider to be a speed not reasonable with the area and the speed limit."); St. John Dep. at 12 ("[W]e observed a vehicle traveling southbound down Garden Street at a high rate of speed."); Miele Dep. at 18 ("A vehicle fitting the description traveling at a high rate of speed . . . had passed us at that point.").  The speed of the vehicle remains a factor that, combined with other factors, may give rise to reasonable suspicion.

police officers encountered the vehicle, the basis for stopping the vehicle was no more particularized.  Further, because the description was vague, the officers did not have sufficient basis to believe Wilson's vehicle was the same vehicle Lollar had encountered.  Given the severity of the crime reported and the possible danger to bystanders or officers of a potentially armed individual traveling away from the scene, had the report of the vehicle leaving the scene been more particularized by including a license plate number or sufficiently detailed description, and had the report reasonably included the fact that the vehicle likely contained an assailant, the court would likely have concluded that no issue of fact existed as to the sufficiency of reasonable suspicion.  However, the description of the vehicle in the radio report and its location was vague, the occupants' alleged link to the shooting was tenuous, and there was no description provided of the occupants.  The fact that the vehicle was traveling quickly and that the officers had little time in which to analyze the situation is not enough to counteract the lack of particularized information about the vehicle or its occupants.  Accordingly, the court cannot conclude that defendant has demonstrated that no issue of fact exists as to the existence of reasonable suspicion to make the stop.

b.      Prolonged Detention of Carter / False Arrest

If the initial stop was not justified, then the detention which followed it was also not justified.  However, because the court finds <u>infra</u> that the defendant police officers are entitled to qualified immunity with regard to the initial stop, the court will separately analyze the detention.  The fact that the initial stop may have been justified does not itself justify a prolonged detention.

16

An investigatory detention, even if initially supported by reasonable suspicion or probable cause, must be "temporary and last no longer than is necessary to effectuate the purpose of the stop." Gilles, 511 F.3d at 245 (quoting Florida v. Royer, 460 U.S. 491, 500 (1983) (plurality opinion)).  "In assessing whether a detention is too long in duration to be justified as an investigative stop, [courts] consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly . . . ." United States v. Sharpe, 470 U.S. 675, 686 (1985).  There are not rigid time limitations; a court must engage in case-by-case analysis.  See id. at 685-86.

Individuals have a right under the Fourth Amendment to be free from arrest in the absence of probable cause.  Gilles, 511 F.3d at 245.  "If police officers restrain an individual in a manner that, though not technically an arrest, is nonetheless so intrusive as to be tantamount to an arrest, probable cause is also required."  Giles, 511 F.3d at 245 (citation and internal quotation marks omitted).  To determine "whether an investigatory stop is sufficiently intrusive to ripen into a de facto arrest," the court must consider:

> the amount of force used by the police, the need for such force, and the extent to which an individual's freedom of movement was restrained, and in particular such factors as the number of agents involved, whether the target of the stop was suspected of being armed, the duration of the stop, and the physical treatment of the suspect, including whether or not handcuffs were used.

United States v. Vargas, 369 F.3d 98, 101 (2d Cir. 2004) (citation and internal quotation marks omitted).

In this case, assuming that the defendant police officers had reasonable suspicion to stop the vehicle, they acted properly in quickly ascertaining that the car did

17

not contain an armed assailant, but instead, contained a shooting victim.  Once they

ascertained that Carter was an unarmed victim, even if they had originally had

reasonable suspicion to conduct a vehicle stop, the officers no longer had any objective

justification to continue to detain Carter or the vehicle.  The defendant police officers

nevertheless failed to end the detention; they forcibly removed Carter from the vehicle

and held him to the ground as they attempted to administer first aid, and prevented him

from continuing on to the hospital in Wilson's vehicle or otherwise.  Although handcuffs

were not used, Carter's freedom of movement was fully restrained, and a reasonable

person in Carter's position would not have felt free to leave.  At the time at which the

detention should properly have ended, the police, given Carter's condition, could

reasonably have advised Carter that his medical needs would best be served by waiting

for an ambulance.  However, the officers had no justification for holding Carter to the

ground or refusing to permit him to continue on his way.[9]  Carter has therefore

demonstrated facts from which a reasonable factfinder could conclude that his

continued detention violated the Fourth Amendment.

   3. Carter's Removal from the Vehicle / Use of Excessive Force

   With regard to Carter's removal from the vehicle, the court must address two

interrelated questions: did the defendant police officers have justification to forcibly

---

   [9]Defendants note that it would not have been safe for the police to have permitted the Bonneville to have traveled to the hospital in flagrant violation of the traffic laws, even with a police "escort," as doing so would endanger others.  Defs.' Mem. at 10-11.  The court agrees, but the Bonneville could also have traveled the remaining 1.3 miles to the hospital in compliance with the traffic laws, and still arrived long before the ambulance.  Prior to the initial stop, the defendant police officers did not observe the Bonneville breaking any traffic laws, and they did not detain the vehicle on that basis.  Therefore, at the very least, they  could not detain the vehicle on the preemptive assumption that, if allowed to go on its way, the Bonneville might break traffic laws in an effort to get to the hospital more quickly.

remove Carter from the vehicle, and did they use excessive force in doing so?  Cooper has created an issue of fact as to both questions.

a.    Carter's Removal from the Vehicle

In Maryland v. Wilson, the Supreme Court held that an officer who lawfully makes a traffic stop may order passengers to exit the car pending the completion of the stop.  519 U.S. 408, 414-15 (1997); see also Mollica v. Volker, 229 F.3d 366, 369 (2d Cir. 2000) ("[I]f a stop is lawful, passengers and drivers have no Fourth Amendment interest in not being ordered out of the stopped vehicle.").  Relatedly, an officer's authority is not limited to ordering passengers out of the vehicle; he may also reasonably restrict passengers' movements.  See Brendlin, 127 S. Ct. at 2407 ("It is also reasonable for passengers to expect that a police officer at the scene of a crime, arrest, or investigation will not let people move around in ways that could jeopardize his safety.").  Assuming that the initial stop was lawful, the police officers could lawfully order Carter to exit the vehicle at the time of the initial stop.

Nevertheless, viewing the facts in the light most favorable to the plaintiff, the police officers forcibly removed Carter from the vehicle only after determining that Carter was an unarmed shooting victim.  Once they ascertained that Carter was not armed and that he was in fact an injured victim, not a suspect, they no longer had justification to continue the investigative detention.  Defendant police officers insist that they had the right to order Carter to leave the car under Maryland v. Wilson, and therefore were justified in forcibly removing him from the car once he began to struggle with them.  The court disagrees.  Once any justification for the investigatory detention ended, whether or not Carter had yet exited the car, the defendant police officers did

19

not have the right to further restrain Carter.  Nor could justification for restraint originate in Carter's need for medical care; the police do not have a right to detain a non-incarcerated individual in order to force him to submit to unwanted medical care.

Finally, defendant police officers argue that because Carter struggled with the police, they were justified in forcibly removing him from the vehicle.  Yet as Cooper points out, a rational jury could find that by the time of the struggle, the police had already realized that Carter posed no threat, had committed no crime, and was a severely injured victim.  A rational jury could also find that any struggle resulted from Carter's efforts to leave the scene and seek medical attention privately—which was Carter's right—rather than be forced to wait for an ambulance and submit to unwanted first aid by the officers.  Under the circumstances, therefore, a rational jury could conclude that the defendant police officers' decision to forcibly remove Carter from the vehicle violated his Fourth Amendment rights.

> b.    Use of Excessive Force

Claims by a non-incarcerated individual that law enforcement officials used excessive force during a seizure, including an arrest or investigatory stop, are analyzed under the Fourth Amendment's "objective reasonableness" standard.[10]  Graham v. Connor, 490 U.S. 386, 388, 395 (1989).  A court must balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the

---

[10]Defendants claim that Cooper seeks to make out a distinct excessive force claim under the Fourteenth Amendment, which they argue is barred by the Supreme Court's decision in Graham v. Connor, 490 U.S. 386, 395 (1989).  In both his Opposition to defendants' Motion for Summary Judgment and his initial Complaint, Cooper appears to confine his excessive force claims to the Fourth Amendment, and does not address the issue of whether he raises a Fourteenth Amendment claim or whether such claim would be barred by Graham.  The court therefore construes Cooper's excessive force claims as being raised under the Fourth Amendment only.

countervailing governmental interests at stake." Id. at 396 (citation and internal quotation marks omitted).  A police officer making a lawful arrest or investigatory stop has the right to use some amount of physical coercion, or the threat of it, to effect the stop or arrest.  Id.  A court must examine:

> the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

Id. (citation omitted).  The court must judge reasonableness objectively under the circumstances, "from the perspective of a reasonable officer on the scene," and allow for the fact "that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."  Id. at 396-97.

The court has already concluded that, even if the detention was initially justified, once the defendant police officers ascertained that Carter was not armed and that he was in fact an injured victim, not a suspect, they no longer had any justification to continue the investigative detention.  At the time they attempted to remove him from the vehicle, Carter was visibly injured and bleeding.  A rational jury could conclude that under the circumstances, it was not reasonable for the defendant police officers to grab the severely wounded and bleeding Carter by the chest and pull him upright, grab his legs and push them to the floor, forcibly remove him from the vehicle, or detain him while awaiting an ambulance. Nor can Carter's struggles with the police provide justification for further restraint.  As noted, a rational jury could find that by the time of the struggle, the police knew that Carter posed no threat, had committed no crime, and

21

was a severely injured victim.  Therefore, the fact that he struggled would be of no moment.  Accordingly, the court concludes that Cooper has demonstrated facts from which a reasonable factfinder could conclude that the defendant police officers used excessive force in removing Carter from the vehicle and restraining him, in violation of the Fourth Amendment.

4.      Denial or Unreasonable Delay in Medical Treatment

Cooper alleges that the defendant police officers denied and/or unreasonably delayed lifesaving medical treatment, depriving Carter of his Fourth and Fourteenth Amendment rights, and "shocking the conscious."  Compl. at ¶ 37.  The court construes this claim as a Fourth Amendment claim for unreasonable seizure and a Fourteenth Amendment claim for substantive due process.  See, e.g., Lombardi v. Whitman, 485 F.3d 73, 78-79, 81-82 (2d Cir. 2007).

Embedded in this claim are two distinct but related theories of responsibility under the Fourth and Fourteenth Amendments: first, that defendant police officers denied or unreasonably delayed lifesaving medical treatment by detaining Carter at the scene and refusing to let him continue in Wilson's vehicle to the hospital; second, that defendant police officers denied or unreasonably delayed lifesaving medical treatment by delaying calling for an ambulance and by refusing to transport Carter to the hospital in a police cruiser.  The court will address these theories sequentially.

a.      Detention of Carter at the Scene

The court has already addressed Cooper's allegation that Carter's detention at the scene violated Carter's Fourth Amendment rights.  The court will therefore focus this discussion on whether Cooper has made out a Fourteenth Amendment claim.

22

The Due Process Clause provides, "No State shall . . . deprive any person of life, liberty, or property, without due process of law . . . ."  U.S. Const. amend XIV, § 1.  This provision "guarantee[s] more than fair process"; it "cover[s] a substantive sphere as well, barring certain government actions regardless of the fairness of the procedures used to implement them."  County of Sacramento v. Lewis, 523 U.S. 833, 840 (1998) (internal quotation marks and citations omitted).  Substantive due process is violated by certain actions that "shock the conscience."  Id. at 846-47.  Because of the Supreme Court's reluctance to permit the general concept of "substantive due process" to become a font for redressing all harmful government conduct, it has held that:

> [w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims.

Lewis, 523 U.S. at 842 (citations omitted).  In Graham v. Connor, considering the interplay of substantive due process and Fourth Amendment claims, the Supreme Court explained that:

> all claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other "seizure" of a free citizen should be analyzed under the Fourth Amendment and its "reasonableness" standard, rather than under a "substantive due process" approach.

Graham, 490 U.S. at 395.  The court must therefore first determine the appropriate standard under which to analyze Cooper's claims of denial or unreasonable delay in medical treatment.

Lewis cautions that Graham's restrictive rule should not be applied indiscriminately.  See 523 U.S. at 843-844.  Substantive due process analysis is

inappropriate, the court explained, only if the claim is covered by a more specific constitutional provision, such as the Fourth Amendment.  <u>Id.</u> at 843.  In <u>Lewis</u>, a police officer undertook a high speed chase of a motorcycle, resulting in the tragic death of the motorcycle passenger when the motorcycle turned sharply left, tipped over, and the patrol car skidded into the passenger.  <u>Id.</u> at 837.  The Court explained that, because a police pursuit in an attempt to seize a person does not amount to a seizure until movement is terminated "through means intentionally applied," no seizure took place, and therefore the Fourth Amendment did not apply.  <u>Id.</u> at 843-44 (quoting <u>Brower v. County of Inyo</u>, 489 U.S. 593, 596-97 (1989)).  Accordingly, and because no other amendment applied, the court proceeded to the substantive due process analysis.

By contrast, in the instant case, a seizure did take place.  Cooper's claim—that the defendant police officers detained Carter and in doing so, denied or unreasonably delayed Carter's ability to get medical treatment—seeks redress for harm caused by Carter's detention, that is, his seizure.  Accordingly, Cooper's claim is "covered" by the Fourth Amendment, and substantive due process analysis is not appropriate.  <u>Id.</u> at 843-44.

> b.    Delay in Calling for an Ambulance and Refusal to Transport Carter by Police Cruiser

In addition to his claim of wrongful detention, Cooper alleges that defendant police officers denied or unreasonably delayed lifesaving medical treatment by delaying calling for an ambulance and by refusing to transport Carter to the hospital in a police cruiser, in violation of the Fourth and Fourteenth Amendments.  Cooper has not articulated a theory of how the delay in calling for an ambulance and refusal to transport

24

Carter to the hospital in a police cruiser violated his Fourth Amendment right to be free from unreasonable searches and seizures.  Accordingly, the court will consider only his Fourteenth Amendment claim.

The court must first determine whether Cooper's Fourteenth Amendment claim is foreclosed by the aforementioned rule that claims covered by an explicit textual source of constitutional protection must be analyzed according to that source, rather than under the more generalized notion of substantive due process.  Lewis, 523 U.S. at 842; Graham, 490 U.S. at 394-95.  Even though the alleged delay in calling for an ambulance and refusal to transport Carter also occurred contemporaneously with Carter's seizure, Cooper's Fourteenth Amendment claim of denial or delay does not challenge his detention or the force used in effecting the detention—claims which would be covered by the Fourth Amendment.  See Graham, 490 U.S. at 394-95.  Instead, Cooper's claim seeks redress for actions of the defendant police officers that occurred in the context of the seizure, but were not directly related to it, and for which the Fourth Amendment does not afford redress.  The court therefore concludes that Cooper's Fourteenth Amendment claim is not foreclosed by the rule articulated in Lewis and Graham.

The Due Process Clause of the Fourteenth Amendment protects citizens from "unjustified intrusions on personal security."  Matican v. City of New York, 524 F.3d 151, 155 (2d Cir. 2008) (quoting Ingraham v. Wright, 430 U.S. 651, 673 (1977)).  However, in the seminal case of DeShaney v. Winnebago County Department of Social Services, the Supreme Court held that, "nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion

25

by private actors." 489 U.S. 189, 195 (1989).  The Court elaborated that the Clause,

> generally confer[s] no affirmative right to government aid, even where such aid
> may be necessary to secure life, liberty, or property interests of which the
> government itself may not deprive the individual. . . . If the Due Process Clause
> does not require the State to provide its citizens with particular protective
> services, it follows that the State cannot be held liable under the Clause for
> injuries that could have been averted had it chosen to provide them.

Id. at 196-97 (internal citations omitted).

The Second Circuit has identified two exceptions to the general rule of

DeShaney.  See Matican v. City of New York, 524 F.3d 151, 155 (2d Cir. 2008).  "First,

the state or its agents may owe a constitutional obligation to the victim of private

violence if the state had a 'special relationship' with the victim."  Id. (citing Ying Jing Gan

v. City of New York, 996 F.2d 522, 533 (2d Cir. 1993)).  "Second, the state may owe

such an obligation if its agents in some way assisted in creating or increasing the

danger to the victim."  Id. (quoting Dwares v. City of New York, 985 F.2d 94, 98-99 (2d

Cir. 1993) (internal quotation marks omitted)).  The distinction between these two

categories of cases "suggests that 'special relationship' liability arises from the

relationship between the state and a particular victim, whereas 'state created danger'

liability arises from the relationship between the state and the private assailant."  Pena

v. DePrisco, 432 F.3d 98, 109 (2d Cir. 2005).  Even if the defendant police officers'

behavior falls within one of these two exceptions, Cooper must also show that the

behavior was "so egregious, so outrageous, that it may fairly be said to shock the

contemporary conscience."  Matican, 524 F.3d at 155 (quoting Lewis, 523 U.S. at 848

n.8).

i.      Special Relationship

The "special relationship" exception "grows from the DeShaney Court's observation that 'in certain limited circumstances the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals.'" Matican, 524 F.3d at 155 (quoting DeShaney, 489 U.S. at 198).  "'[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being.'"  Id. at 156 (quoting DeShaney, 489 U.S. at 199-200).  While most cases found to qualify for the exception involve incarceration or institutionalization, neither of which was present in this case, the language in the caselaw speaks in terms of "involuntary custody as the linchpin of any special relationship exception."  Id.  For example, the Second Circuit has applied the exception to a parolee who complained that he was placed in an allegedly uninhabitable home, holding that, "a parolee, although not in the state's physical custody, is nonetheless in its legal custody, and his or her freedom of movement, while not as restricted as that of an incarcerated prisoner, is nonetheless somewhat curtailed."  Jacobs v. Ramirez, 400 F.3d 105, 106 (2d Cir. 2005).  DeShaney itself noted that "[t]he affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf."  489 U.S. at 200.

Viewing the facts in the light most favorable to the plaintiff, this case clearly fits the "special relationship" exception.[11]  Carter was detained by the defendant police officers against his will, and therefore was involuntarily in their custody.  While in their custody, he attempted to act on his own behalf to obtain medical care, but was prevented from doing so by the defendant police officers.  Therefore, owing to the "special relationship," the defendant police officers had an affirmative duty to protect Carter, notwithstanding the general rule of DeShaney.

ii.      Shocks the Conscience

Although the defendant police officers' behavior falls within the "special relationship" exception, they can only be held liable if their actions in delaying calling for an ambulance and refusing to transport Carter in a police cruiser "shock the conscience."  See Lombardi, 485 F.3d at 81.  To shock the conscience, official conduct must be "outrageous and egregious under the circumstances; it must be truly brutal and offensive to human dignity."  Id. (internal quotation and citation omitted).  "In gauging the shock, negligently inflicted harm is categorically beneath the threshold, while conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level."  Id. at 82 (quoting Lewis, 523 U.S. at 849) (internal quotation marks omitted).  In between these two extremes lies deliberate indifference, which requires an "exact analysis of the circumstances" because "[d]eliberate indifference that shocks in one environment may not be so patently egregious in another . . . ."  Id. (quoting Lewis, 523 U.S. at 850)

---

[11]Because the case clearly fits the "special relationship" exception, the court need not consider whether it also fits the "state created danger" exception.

(internal quotation marks omitted). There is no allegation that the officers sought to intentionally injure Carter.  Therefore, the court must determine whether the evidence would support a finding by a rational jury that the defendant police officers acted with deliberate indifference.

The Supreme Court has cautioned against finding deliberate indifference when police officers "have obligations that tend to tug against each other," such as in the context of a high-speed chase, because officers "are supposed to act decisively and to show restraint at the same moment, and their decisions have to be made 'in haste, under pressure, and frequently without the luxury of a second chance.'" Lewis, 523 U.S. at 853 (quoting Whitley v. Albers, 475 U.S. 312, 320 (1986)).  In such circumstances, "an intermediate level of fault, such as recklessness, is not enough to impose constitutional liability."  Pena, 432 F.3d at 113 (quoting Medeiros v. O'Connell, 150 F.3d 164, 170 (2d Cir. 1998)).  "Lewis made it clear that such emergency situations may—perhaps must—be treated differently than those in which time for reflection is possible."  Id.  On the other hand,  "Lewis also indicated that less culpable mental states may more easily shock the conscience when the victim is in state custody."  Id. at 113 n.22 (citations omitted).  In particular, Lewis noted that recklessness, specifically deliberate indifference to the medical needs of individuals in pretrial detention, is sufficient to satisfy the fault requirement of a due process claim.  Lewis, 523 U.S. at 849-50.  Still, Lewis grounded its analysis in the fact that in the custody context, there is ordinarily no "substantial countervailing interest [that] excuse[s] the State from making provision for the decent care and protection of those it locks up," id. at 851, and explicitly noted that in the fast moving context of a violent prison disturbance, "a much

29

higher standard of fault than deliberate indifference has to be shown for officer liability
. . . .," id. at 852-53.

The facts of instant case fit uneasily among these categories.  Militating against
a finding of deliberate indifference is the fact that the situation was a fast-moving
emergency and required the officers to make quick decisions under pressure, without
the benefit of reflection.  Militating in favor of such a finding is the fact that Carter was in
custody.  In addition, the situation is not analogous to a violent prison disturbance or
high-speed chase, in which obligations tug against one another.  Instead, once the
officers had assessed the situation and ascertained that the car contained a victim,
which occurred early in the encounter, the officers' obligation became to ensure that
Carter received medical care in the most expedient and appropriate fashion.

Cooper alleges that the defendant police officers exhibited deliberate
indifference to Carter's medical needs by delaying calling for an ambulance and
refusing to transport Carter in a police cruiser to the hospital.  The court emphasizes
that at this stage of the litigation, it must view the evidence in the light most favorable to
the plaintiff.  As to the delay in calling for an ambulance, Wilson informed the officers
immediately upon being stopped that there was a gunshot victim in the back of her
vehicle.  Yet before calling for an ambulance, the following events occurred: the officers
approached the backseat of Wilson's vehicle with their guns drawn; they yelled at
Carter; they waited for another police cruiser to arrive to supply them with gloves before
proceeding further; they struggled with Carter in the backseat of the vehicle; and they
removed Carter from the vehicle.  Only then did they call for an ambulance.  The court
recognizes that the defendant police officers were acting in a fast-moving situation,

30

without time for deliberation.  However, once they knew that the vehicle contained a gunshot victim, and given that they were restraining Carter and preventing Wilson's vehicle from traveling to the hospital, they had the obligation to call for an ambulance as soon as possible.  A rational jury could conclude from the evidence that by not immediately calling for an ambulance or permitting the vehicle to continue on its way to the hospital, the defendant police officers were deliberately indifferent to Carter's medical needs, and thus violated his rights to substantive due process.

As for the refusal to transport Carter in a police cruiser, that poses a more difficult question.  The officers detained Carter, which interrupted his travel to the hospital.  They were aware that the ambulance's response might be delayed because another shooting had taken place that evening.  On the other hand, they also knew that an ambulance could provide better medical care en route to the hospital than the officers were capable of providing.  They also believed, whether correctly or not, that Hartford Police Department policy or practice always provided for the transport of injured persons in ambulances.  Though in the instant case the refusal to transport by cruiser may have had mortal consequences, in the typical case, transport by ambulance may be more desirable.  Finally, the officers acted under pressure and without the benefit of reflection.  Though in hindsight a cruiser transport in the instant case may have been more desirable, the court concludes that, viewing the facts in the light most favorable to the plaintiff, as a matter of law, the defendant police officers' refusal to transport Carter in their cruisers did not exhibit deliberate indifference to Carter's medical needs or shock the conscience such that it would be appropriate to impose liability on the officers for a substantive due process violation.

31

5.      Qualified Immunity: Were Rights Clearly Established?

The court has concluded, viewing the facts in the light most favorable to the plaintiff, that a rational trier of fact could conclude that defendant police officers violated Carter's constitutional rights.  Specifically, a rational trier of fact could conclude that defendant police officers violated Carter's Fourth Amendment right to be free from unreasonable searches and seizures with regard to the vehicle stop, his prolonged detention, his removal from the vehicle, and use of excessive force in removal, and violated his Fourteenth Amendment right to substantive due process with regard to the delay in calling for an ambulance.

The court must now determine whether those rights were clearly established on May 14, 2005.  To make that determination, the court inquires "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Walczyk, 496 F.3d at 154 (quoting Saucier v. Katz, 533 U.S. 194, 202 (2001)) (emphasis in Walczyk).  "If the conduct did not violate a clearly established constitutional right, or if it was objectively reasonable for the officer to believe that his conduct did not violate such a right, then the officer is protected by qualified immunity." Gilles, 511 F.3d at 244 (citations omitted).  The Second Circuit has identified the factors that courts must consider:

> (1) whether the right in question was defined with "reasonable specificity"; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

Pena v. DePrisco, 432 F.3d 98, 115 (2d Cir. 2005) (citations omitted).  The court must separately consider each alleged rights violation.

32

a.      Initial Vehicle Stop

The court has concluded that a rational jury, viewing the facts in the light most favorable to the plaintiff, could conclude that the police lacked reasonable suspicion to conduct the initial investigatory stop of Wilson's vehicle.  However, even if the totality of circumstances were insufficient to give rise to reasonable suspicion, defendant police officers had an objectively reasonable belief that the stop of the vehicle was justified, and their actions are therefore protected by qualified immunity.  See Holeman, 425 F.3d at 191 ("Even if the totality of facts were insufficient to satisfy probable cause or reasonable suspicion, Officer Williams' belief that they were was objectively reasonable, and therefore protected by qualified immunity.").  Defendant police officers were in a unit responding to a shooting.  While en route to the shooting site, they encountered a vehicle, traveling quickly, that they believed to match a vehicle that had been put out over the radio as possibly containing a suspect or victim.  At the time, the facts of the shooting were largely unknown to the officers, and they were acting under the time pressure of a rapidly unfolding situation.  They had to immediately determine whether to stop the vehicle.  Although they encountered the vehicle almost one mile away from the shooting scene, and did not know the license plate number, make, or description of the occupants of the vehicle that Lollar had seen, under the facts and circumstances, their belief that it was the same vehicle, based on the fact that the vehicle was quickly traveling southbound on a parallel street one block west of the street where the shooting took place, was objectively reasonable.  Therefore, even if hindsight reveals that the totality of the information before the officers did not give rise to reasonable suspicion, under the pressured circumstances, the officers had an objectively

reasonable belief that they had justification to stop the vehicle.  Accordingly, the

defendant police officers are entitled to qualified immunity on the question of whether

the vehicle stop was lawful.

> b.      Prolonged Detention / False Arrest

Carter's right to be free from arrest in the absence of probable cause, and to

avoid prolonged investigatory detention without cause, was clearly established on May

14, 2005.  The Supreme Court had long held that an investigatory detention must be

temporary and last no longer than necessary, and the Second Circuit had identified the

relevant factors from which courts determine whether an investigatory stop is

sufficiently intrusive to ripen into a de facto arrest.  See Royer, 460 U.S. at 500; Vargas,

369 F.3d at 101.  A reasonable officer would have understood on May 14, 2005, that in

the absence of probable cause or reasonable suspicion, he could not restrain Carter

past the point necessary to ascertain that he was an unarmed shooting victim.

Furthermore, because Carter made clear his desire to leave the officers' custody and

go to the hospital either in Wilson's vehicle or on his own power, Carter's prolonged

detention is distinguishable from a situation where a citizen in need of medical

assistance, not initially subject to investigative detention or arrest, may come into

physical contact with the police as they attempt to deliver such assistance.  Defendant

police officers are therefore not entitled to qualified immunity on the claims of prolonged

detention and false arrest.

> c.      Removal from the Vehicle

While the court has concluded that a rational jury, viewing the facts in the light

most favorable to the plaintiff, could conclude that Carter's removal from the vehicle

34

violated his Fourth Amendment rights, the court concludes that this right was not clearly established and thus the officers are entitled to qualified immunity.  In <u>Maryland v. Wilson</u>, the Supreme Court held that an officer who lawfully makes a traffic stop may order passengers to exit the car pending the completion of the stop.  519 U.S. at 414-15.  The court has found that the officers had an objectively reasonable belief that the stop was lawful, which would have authorized the police officers to order Carter to exit the vehicle at the time of the stop.  While the court concludes that the defendant police officers did not have the right to remove Carter from the vehicle once they had realized that no reasonable suspicion existed to make the stop, that there was no basis to suspect any vehicle occupant was armed or dangerous or had been involved in criminal activity, and that Carter posed no threat, the court finds that a reasonable defendant official may not have understood the removal to be unlawful.  Further, the court concludes that the contours of the law surrounding the Fourth Amendment interests of vehicle passengers, which has been in flux since the late 1990s, was not developed with reasonable specificity on May 14, 2005, such that a reasonable defendant official would have understood Carter's removal to be unlawful.  Therefore, the defendant police officers are entitled to qualified immunity on Carter's claims stemming from his removal from the vehicle.

d.    Excessive Force in Removal

Carter's right to not have the officers use excessive force in removing him from the vehicle was clearly established on May 14, 2005.  In <u>Graham v. Connor</u>, the Supreme Court set out the standard by which claims by a non-incarcerated individual that law enforcement officials used excessive force during a seizure are to be judged.

35

490 U.S. 386.  Courts are directed to look at the severity of the crime at issue, whether

the suspect poses an immediate threat to officer safety, and whether he is actively

resisting arrest or attempting to evade arrest.  Id. at 396.  The determination is case

specific.  In Carter's case, the facts and circumstances all militate against the use of

physical coercion.  It would be clear to a reasonable officer that grabbing a severely

wounded and bleeding man by the chest and legs, and physically restraining him once

he was outside the vehicle, after the officer had already determined that there was no

justification to arrest Carter, he posed no threat, and was a severely injured victim,

would be unlawful.  Defendant police officers are therefore not entitled to qualified

immunity on the claims of excessive force.

e.      Delay in Calling for an Ambulance

Although the question is a close one, the court finds that Carter's Fourteenth

Amendment substantive due process right to have the officers not delay in calling an

ambulance was clearly established on May 14, 2005.  It would have been clear to a

reasonable officer on that date that, because he was detaining Carter, a severely

injured victim, and limiting Carter's ability to act on his own behalf by preventing his

travel to the hospital in Wilson's vehicle or on his own power, the officer had an

affirmative duty to assume responsibility for Carter's safety and general well-being.

Jacobs v. Ramirez, which the Second Circuit decided a few months before the events in

this case, made clear that the affirmative duty to protect individuals in custody applied

not only to incarcerated or institutionalized individuals, but to any individual in physical

or legal custody.  400 F.3d at 106.  Further, it would be clear to a reasonable officer that

it would not be lawful to detain a severely injured gunshot victim just over a mile from

36

the hospital without making immediate provision for his medical needs.  A reasonable officer would understand it to be deliberately indifferent—that is, unlawful—to delay obtaining medical care in this situation by not calling for an ambulance immediately upon hearing that a gunshot victim was present in the vehicle, rather than delaying until they had secured the back seat, obtained gloves, and removed Carter from the vehicle.[12]  Defendant police officers are therefore not entitled to qualified immunity with regard to the substantive due process claims.

B.    Count One: Claims Against City of Hartford

Cooper alleges that the City of Hartford had in effect de facto policies, practices, and customs that exhibited deliberate indifference to the safety and lives of the citizens and residents of Hartford, and that they caused the defendant police officers to engage in unconstitutional conduct.  In his Complaint, Cooper alleges that a wide range of de facto City policies, practices, and customs are unconstitutional.  He also claims that the City is liable for the failure to investigate allegations of misconduct.  However, in his Opposition to defendants' Motion, Cooper limits his claims.  First, he seeks to make out a failure to train claim, limiting that claim to three areas: failure to train defendant police officers in determining reasonable suspicion and probable cause, the use of reasonable force, and facilitating lifesaving medical treatment for injured persons within its custody.[13]  See Pl.'s Opp'n at 47.  Second, Cooper alleges that the City of Hartford had

_____

[12]The court recognizes that the testimony as to when the officers called an ambulance is in conflict, and that at trial, the jury may find that the officers in fact called an ambulance within a reasonable period of time.  However, at summary judgment, the court must view the facts in the light most favorable to the plaintiff.

[13]In addition, as noted supra, Cooper's Complaint states claims against Chief Patrick Harnett, which he abandons in his Opposition.  See Opp'n at 46 n.5.

37

a de facto policy or custom to not transport gravely injured persons in a police cruiser for medical treatment, and contends that this policy or custom amounts to a deliberate indifference to medical needs.  Id. at 49.

        1.    Failure to Train

The court will first address whether plaintiff has demonstrated, as he asserts, that "[g]enuine factual issues exist" as to the City's liability for failure to train in the three identified areas.

Municipalities are liable for the unconstitutional acts of municipal employees only when the municipality itself can be said to have committed the misdeed; that is, when the misdeed results from the execution of a government policy or custom.  Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978).  "A city's failure to train its subordinates satisfies the policy or custom requirement only where the need to act is so obvious, and the inadequacy of current practices so likely to result in a deprivation of federal rights, that the municipality . . . can be found deliberately indifferent to the need."  Reynolds v. Giuliani, 506 F.3d 183, 192 (2d Cir. 2007) (citing City of Canton v. Harris, 489 U.S. 378, 390 (1989)). More specifically, "the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact."  Harris, 489 U.S. at 388.

In Walker v. City of New York, the Second Circuit established the circumstances under which a failure to act amounts to deliberate indifference: (1) the City knows to a moral certainty that its employees will confront a given situation; (2) the situation presents the employee with a difficult choice of the type that training or supervision would make less difficult, or there is a history of employees mishandling the situation;

38

and (3) the wrong choice by the city employee would frequently cause the deprivation of a citizen's constitutional rights.  974 F.2d 293, 297-98 (2d Cir. 1992).  In a failure to train case, a plaintiff ordinarily establishes deliberate indifference by showing "that the officials consciously disregarded a risk of future violations of clearly established constitutional rights by badly trained employees."  Amnesty Am. v. Town of West Hartford, 361 F.3d 113, 127 n.8 (2d Cir. 2004) (citing Harris, 489 U.S. at 389-90).

In addition to establishing that the alleged failure to train constituted deliberate indifference, plaintiffs must also prove causation.  That is, a plaintiff must identify a specific deficiency in the city's training program and "establish that that deficiency is 'closely related to the ultimate injury,' such that it 'actually caused' the constitutional deprivation."  Id. at 129 (quoting Harris, 489 U.S. at 391).  Demonstrating "negligent administration of a sound program," or that one or more officers negligently or intentionally disregarded otherwise appropriate training, does not suffice.  Id. at 129-30.

To survive summary judgment on a failure to train claim, a plaintiff must proffer "evidence as to the city's training program and the way in which that program contributed to the violation."  Id. at 127 n.8; see id. at 130 n.10.  Ordinarily, a plaintiff should introduce evidence of "how the training was conducted, how better or different training could have prevented the challenged conduct, or how 'a hypothetically well-trained officer would have acted'" differently under the circumstances.  Id. at 130.  Because the focus of the analysis in a failure to train claim is on the training itself, "[t]he factfinder's inferences of inadequate training and causation must be based on more than the mere fact that the misconduct occurred in the first place."  Id. (citing Harris, 489 U.S. at 390-92).

Even assuming that he could establish deliberate indifference, Cooper has not introduced evidence as to the details of the training provided to officers or how better or different training could have prevented the challenged conduct.  To establish a lack of training, Cooper points to deposition testimony and interrogatories, which he contends would support a jury finding that the police officers received no training at all regarding how to handle injured persons in need of lifesaving medical treatment.  Cooper also contends that the defendant police officers received no training or training materials whatsoever following their education at the police academy.  In the deposition testimony to which Cooper cites, Hopkins was asked if he had received any training or was otherwise aware of written protocols "as to the priority that medical treatment must take when a police officer is presented with someone in a potentially life threatening condition?"  Hopkins Dep. at 45.  Hopkins replied that he did not recall.  Id.  Cooper also cites to interrogatories.  In response to an interrogatory about training generally received for the defendant's "current [position]," Hopkins responded that he had received "on the job training and in service training" since his time at the police academy, St. John referred to "mandatory service training," Miele responded that he was retired so the question was not applicable, and Otero also referenced "mandatory in-service training."  Pl.'s Ex. 10 at ¶ 5; Pl.'s Ex. 11 at ¶ 5; Pl.'s Ex. 12 at ¶ 5; Pl.'s Ex. 13 at ¶ 5.  In response to an interrogatory about documents "concerning the law of making investigatory stops, detaining, frisking, searching, administering and providing first aid, and administering and providing emergency medicine," Hopkins responded, "None in my possession," and the other three defendant police officers responded "Unknown."  Pl.'s Ex. 10 at ¶ 19; Pl.'s Ex. 11 at ¶ 5; Pl.'s Ex. 12 at ¶ 5; Pl.'s Ex. 13 at ¶

5.  Finally, Cooper also contends that, because defendants have failed to establish the fact that training is adequate, that a jury could conclude it is inadequate.

The court disagrees with Cooper that a rational jury, viewing the facts in the light most favorable to the plaintiff, could conclude from the evidence in the record that the plaintiff has proven a failure to train claim.  The deposition questions and answers, and interrogatory questions and answers to which Cooper points, are insufficient to create an issue of fact.  Each of the defendant police officers references having received mandatory in-service training.  There is no evidence in the record as to the contents of the mandatory in-service training to which each defendant referred, how training was conducted, or how better or different training might have prevented the conduct at issue in this case.  Cooper may not shift the burden to the defendants to establish the adequacy of training: the burden of persuasion lies on Cooper as to the ultimate issue. In order to survive summary judgment, he must proffer evidence from which a rational jury could conclude that he has proven a failure to train claim.  Because the evidence in the record is not sufficient to meet such a burden, the court grants defendants' Motion for Summary Judgment as to Cooper's failure to train claim.

2.     <u>Transportation of Gravely Injured Individuals by Cruiser</u>

The court will next address Cooper's claim that the City of Hartford had a de facto policy or custom not to transport gravely injured persons in a police cruiser for medical treatment, and that this policy or custom amounts to a deliberate indifference to citizens' medical needs.  Municipalities can be held liable under section 1983 when a government policy or custom deprives a plaintiff of his constitutional right.  <u>Monell</u>, 436 U.S. at 690-91.

Cooper has set forth sufficient evidence to create an issue of fact as to whether the City had a de facto policy or custom to not transport gravely injured persons in a police cruiser for medical treatment.  Sergeant Miele indicated in his testimony that the Department policy was to call for an ambulance to transport injured victims to the hospital, rather than to transport them via police cruiser.  Miele Dep. at 41-42; see also St. John Dep. at 22-26.

Cooper has not articulated, however, the ways in which this policy or custom amounts to a deliberate indifference to citizens' medical needs.  Even if the effects of the officers' refusal to transport Carter in their cruiser may have contributed to Carter's damages, that does not mean that the general policy or custom of transporting injured citizens in ambulances rather than police cruisers amounts to deliberate indifference to citizens' medical needs.  It may be reasonable for the City to decide that transport by ambulance is better in the typical case, because the ambulances can provide better medical care en route to the hospital than officers are capable of providing.  Because Cooper has not come forward with evidence suggesting that the policy generally results in unconstitutional effects or is itself unconstitutional, Cooper has not created an issue of fact as to his claim that the City has an unconstitutional policy or custom of refusing to transport individuals by police cruiser.  Accordingly, the court grants defendants' Motion for Summary Judgment as to this claim.

C.   State Law Counts

1.   Count Two: State Constitutional Claims

In Count Two, Cooper seeks damages pursuant to Article first, sections 7 and 9 of the Connecticut Constitution.  Section 7 mirrors the Fourth Amendment's protections

against unreasonable searches and seizures, but provides greater protection in certain instances.  State v. Davis, 283 Conn. 280, 305-06 (2007).  Section 9 provides that "[n]o person shall be arrested, detained or punished, except in cases clearly warranted by law."  Cooper asserts a claim against defendant police officers for infringing his right to be free from unreasonable searches and seizures, false arrest, and excessive force.  He also asserts a claim against the City[14] for unconstitutional policies, practices, and customs.

    The Connecticut courts' substantive interpretations of these state constitutional provisions have been similar, but not identical to, interpretations of the Fourth Amendment rendered by federal courts.  See State v. Burroughs, 288 Conn. 836, 844-47 & n.6-7 (2008).  For the purposes of the allegations in this case, the parties have not called the court's attention to any ways in which substantive differences in the provisions would affect the outcome of this case, and the court is not aware of any.  Accordingly, the court adopts its analysis already employed in analyzing the federal constitutional claims and concludes that Cooper survives summary judgment on his state constitutional claims to the same extent as he survives on his federal claims.  However, because qualified immunity is not available for state constitutional claims, the court conducts a separate analysis of Connecticut immunities, infra.  See Fleming v. City of Bridgeport, 284 Conn. 502, 531 (2007) (applying state law governmental immunity to claims under the Connecticut Constitution); Mulligan v. Rioux, 229 Conn. 716, 728-30 (1994) (discussing distinctions between qualified immunity in section 1983

---

[14]As previously noted, Cooper abandons his claims against Harnett.

43

claims and state law immunity).

2.    Count Three: Wrongful Death

In Count Three, Cooper seeks damages under Connecticut's wrongful death statute, Conn. Gen. Stat. § 52-555.  The wrongful death statute permits recovery by a decedent's estate "from the party legally at fault for such injuries just damages together with the cost of reasonably necessary medical, hospital and nursing services, and including funeral expenses . . . ." Conn. Gen. Stat. § 52-555(a).  To recover,

> The plaintiff must prove not only a violation of a standard of care as a wrongful act, but also a causal relationship between the injury and the resulting death.  A causal relation between the defendant's wrongful conduct and the plaintiff's injuries is a fundamental element without which a plaintiff has no case.  If the chain of causation of the damage, when traced from the beginning to the end, includes an act or omission which, even if wrongful or negligent, is or becomes of no consequence in the results or so trivial as to be a mere incident of the operating cause, it is not such a factor as will impose liability for those results.

Ward v. Greene, 267 Conn. 539, 546-47 (2004) (quoting Grody v. Tulin, 170 Conn. 443, 448-49 (1976)).

Defendant police officers seek summary judgment on Cooper's wrongful death claim on the grounds that the defendant police officers did not cause Carter's death and that they are immune from Cooper's claims.  Because these objections are shared with the other counts, the court will address them separately, infra.

Defendant City of Hartford seeks summary judgment on the above grounds and also on the ground that Carter's death did not result from wrongful policies, practices, or customs for which the City can be held responsible.  The court does not construe plaintiff's complaint to raise a wrongful death claim in Count Three based upon policies, practices, or customs.  See Compl. at Count Three.  Instead, plaintiff alleges that the

44

defendant police officers engaged in negligent acts and omissions in the scope of their employment, and caused pre-death damages as well as death, for which Cooper seeks to hold the City responsible.  Id.  Under Connecticut law, a municipality, subject to certain immunities, can be held liable for the negligent act or omission of a municipal officer acting within the scope of his or her employment.  Conn. Gen. Stat. § 52-557n(a)(1).  There is no dispute that the defendant police officers were acting in the scope of their employment at the time of the alleged incident.  Therefore, whether Cooper can hold the municipality liable will turn on whether the defendants caused Carter's death, and whether immunity applies.  The court will address causation and immunities separately, infra.

Finally, the court must also address another objection raised by defendants: that the wrongful death statute is the sole basis upon which an action that includes a person's death as an element of damages may be brought.  The court separately addresses this objection as to the state and federal claims.

a.    State law claims

The Connecticut Supreme Court has explained that "[t]he wrongful death statute; General Statutes § 52-555; is the sole basis upon which an action that includes as an element of damages a person's death or its consequences can be brought."  Lynn v. Haybuster Mfg., Inc., 226 Conn. 282, 295 (1993).  This rule requires that the executor bring claims on behalf of the decedent pursuant to the wrongful death statute, and bars other interested parties from bringing claims except as authorized by statute.  For example, in Ladd v. Douglas Trucking Co., the Connecticut Supreme Court held that a spouse's claim for postmortem loss of consortium was foreclosed, because it was not

45

permitted at common law and the wrongful death statute did not permit such claims. 203 Conn. 187, 191, 196-97 (1987), superseded by statute, Public Acts 1989, No. 89-148, Conn. Gen. Stat. § 52-555a, as recognized in Lynn, 226 Conn. at 296 n.12.  Ladd explained, however, that the wrongful death statute was enacted to allow "the estate of the victim to recover all of the damages resulting from a death," including for "destruction of his earning capacity," and "for the termination of the decedent's ability to carry on nonpecuniary activities of life."[15]  Id. at 196-97.  The statute's focus, the court explained, was "upon the value of the decedent's life from his viewpoint" rather than "that of his family," for which reason the court decided to leave to the legislature the question of whether to recognize a right to recovery in the spouse.  Id.

In this case, only Carter's executor, Cooper, has sought to bring claims related to Carter's death and its consequences.  Defendants contend that the rule that the wrongful death statute is the "sole basis" upon which such actions may be brought bars Cooper's alternative theories of liability articulated in Counts One and Two.  The court disagrees.  While the plain language of the rule is not a model of clarity, the Connecticut Supreme Court's explication of the rule in Ladd makes clear that the rule's purpose is to channel such claims within the strictures of the wrongful death statute's requirements, not to otherwise limit the ability of a plaintiff to state alternative theories of recovery.  See 203 Conn. 187.  That is, the rule does not prevent an executor "from advancing alternative theories of recovery, or causes of action, pursuant to the wrongful death statute." Monterio v. Crescent Manor, LLC, No. CV030181589S, 2004 WL

---

[15]Compensation for "conscious pain and suffering" is also permitted under the wrongful death statute.  See Sanderson v. Steve Snyder Enters., Inc., 196 Conn. 134, 149 n.12 (1985).

1245906, at *2 (Conn. Super. Ct. May 21, 2004) (quoting Hebert v. Frontier of Ne. Conn., Inc., No. CV010065465, 2004 WL 304277, at *2 (Conn. Super. Ct. Jan. 29, 2004)); but see Torres v. Am. Med. Response of Conn., Inc., No. CV000802360, 2001 WL 1187155 (Conn. Super. Ct. Sept. 6, 2001) ("Clearly, however, the statute was intended to bar plaintiffs from seeking recovery for death as damages under the wrongful death statute in one count and under an alternative theory of liability in a separate count that relies on the same conduct.").

Finally, while Cooper does not explicitly articulate that each state law cause of action is brought under the wrongful death statute, the court construes the Complaint as raising causes of action in Counts Two and Four pursuant to the wrongful death statute, and Count Three as raising a negligence claim pursuant to the wrongful death statute.

### b.    Federal Claims

Defendants suggest that section 1983 claims should also be subject to the limitations of the wrongful death statute.  Mot. at 32-33 (referencing Count One).  The Supreme Court has held that, pursuant to 42 U.S.C. § 1988, the survivorship of section 1983 claims is generally a question of state law, unless state law is generally inhospitable to the survival of section 1983 claims.  Robertson v. Wegmann, 436 U.S. 584, 590, 594 (1978).  However, in Robertson, the Supreme Court declined to address the related question at issue in this case—"whether abatement based on state law could be allowed in a situation in which deprivation of federal rights caused death."  Id. at 594.  The Second Circuit subsequently held that:

> [L]imitations in a state survival statute have no application to a section 1983 suit brought to redress a denial of rights that caused the decedent's death. . . . To whatever extent section 1988 makes state law applicable to section 1983

47

actions, it does not require deference to a survival statute that would bar or limit
the remedies available under section 1983 for unconstitutional conduct that
causes death.

McFadden v. Sanchez, 710 F.2d 907, 811 (2d Cir. 1983).  Further, in the case of Dodd

v. City of Norwich, 827 F.2d 1 (2d Cir. 1987), the Second Circuit dismissed a wrongful

death claim against one defendant while permitting a section 1983 claim to potentially

survive against that defendant.

This case, which seeks to redress the denial of Carter's constitutional rights

resulting in his death, is on all fours with McFadden.  The court therefore concludes that

Connecticut's wrongful death statute does not apply to limit the theories of liability,

bases of recovery, or remedies otherwise available to Cooper on his section 1983

claims in Count One.

3.    Count Four: Negligent Infliction of Emotional Distress

To prevail on a claim of negligent infliction of emotional distress under

Connecticut law, a plaintiff must show that: "(1) the defendant's conduct created an

unreasonable risk of causing the plaintiff emotional distress; (2) the plaintiff's distress

was foreseeable; (3) the emotional distress was severe enough that it might result in

illness or bodily harm; and (4) the defendant's conduct was the cause of the plaintiff's

distress."  Carrol v. Allstate Ins. Co., 262 Conn. 433, 444 (2003).

Cooper has set forth issues of fact as to each of these elements.  In particular,

defendant police officers' forced restraint and detention of Carter as he sought to

escape the scene to obtain medical care created an unreasonable risk of causing

Carter emotional distress.  Carter's struggle to escape made clear that he wished to

continue on his way to the hospital.  It was foreseeable to the officers that the forced

48

restraint of a severely-injured man when he is only 1.3 miles away from the modern medical technology that could save his life might cause severe emotional distress. Accordingly, defendants are not entitled to summary judgment on this claim.

    4. Count Seven: Indemnification

   Connecticut law provides that municipalities must indemnify employees when they are found liable for an infringement of civil rights or physical damage to a person, provided that the employee was acting in the performance of his duties and the scope of employment at the time of the challenged occurrence, and the damage did not result from willful or wanton acts.  Conn. Gen. Stat. § 7-465; <u>Myers v. City of Hartford</u>, 84 Conn. App. 395, 399, 400 (2004).  Defendants seek summary judgment on the indemnification count solely on the ground that there are no genuine issues of material fact with regard to plaintiff's underlying claims that defendant police officers are liable. Defs.' Mem. at 39.  The court has concluded that there are issues of fact relating to the defendant police officers' liability on several of plaintiffs' claims.  Therefore, as to the underlying claims on which the court has found an issue of fact, defendant City is not entitled to summary judgment on Cooper's claims for indemnification; defendant City is entitled to summary judgment on Cooper's claims for indemnification as to all other underlying claims.

   D. <u>State Law Counts—Immunity</u>

   The court will now consider whether the defendant police officers and the City are entitled to immunity on Cooper's state law claims.

1.      Defendant Police Officers

Connecticut law provides that:

> [A] municipal employee is liable for the misperformance of ministerial acts, but
> has a qualified immunity in the performance of governmental acts.
> Governmental acts are performed wholly for the direct benefit of the public and
> are supervisory or discretionary in nature.  In contrast, ministerial refers to a duty
> which is to be performed in a prescribed manner without the exercise of
> judgment or discretion.

Mulligan v. Rioux, 229 Conn. 716, 727 (1994) (citations and internal quotation marks

omitted).  The defendants' police officers' actions clearly fall into the category of

discretionary governmental acts, for which defendant police officers receive immunity

unless the case falls into one of three exceptions:

> [F]irst, where the circumstances make it apparent to the public officer that his or
> her failure to act would be likely to subject an identifiable person to imminent
> harm . . . second, where a statute specifically provides for a cause of action
> against a municipality or municipal official for failure to enforce certain laws . . .
> and third, where the alleged acts involve malice, wantonness or intent to injure,
> rather than negligence.

Id. at 728 (citations and internal quotation marks omitted).  Cooper has not suggested

that either the second or third exception applies, but argues in favor of the applicability

of the first exception.[16]  Defendants assert the applicability of governmental immunity

but do not address the exceptions.

---

[16]Defendants also contend that the court's determination of immunity turns on whether the duty
was a public or private duty.  However, the court need not make this determination, because if the
exception applies, then an action may be brought against a municipal employee regardless of whether the
duty allegedly breached was public or private.  See Shore v. Town of Stonington, 187 Conn. 147, 153
(1982) ("Policy considerations have also resulted in the establishment of certain exceptions which provide
that an individual cause of action may be brought against an official for breach of duty without regard to
whether the duty is technically a public or private one."); see also Gordon v. Bridgeport Housing Auth., 208
Conn. 161, 166-67 (1988) ("The Shore opinion outlined limited exceptions to the rule that officials who
undertake discretionary actions are immune from civil liability. . . . One exception is when 'it would be
apparent to the public officer that his failure to act would be likely to subject an identifiable person to
imminent harm.'" (quoting Shore, 187 Conn. at 153)).

"By its own terms, [the first exception] requires three things: (1) an imminent harm; (2) an identifiable victim; and (3) a public official to whom it is apparent that his or her conduct is likely to subject that victim to that harm."  Doe v. Petersen, 279 Conn. 607, 616 (2006).  The first two elements are "evaluated with reference to each other," such that "[a]n allegedly identifiable person must be identifiable as a potential victim of a specific imminent harm," and "the alleged imminent harm must be imminent in terms of its impact on a specific identifiable person.  Id. at 620-21.  To abrogate immunity, it is not sufficient that the challenged actions are "likely to result in some harm to some person"; the circumstances must be specific such that the behavior and its effects are closely linked.  See Seri v. Town of Newtown, 573 F. Supp. 2d 661, 675 (D. Conn. 2008).

At the time the officers stopped the vehicle, it was not apparent to the officers that their conduct was likely to subject any identifiable victim to imminent harm. Therefore, the officers are entitled to immunity on the allegation in Count Two that they had no reasonable suspicion to stop the vehicle.

The requirements to abrogate immunity under this exception have been met as to Cooper's remaining claims: that there was no justification to remove him from the vehicle, that the officers used excessive force in removing him from the vehicle, that he was subject to prolonged detention, that there was a delay in calling for an ambulance, that the defendant police officers acted negligently in causing Carter's death, and that they negligently inflicted emotional distress on Carter.  By the time the defendant police officers began to remove Carter from the vehicle, Carter was in the custody of the defendant police officers, who were aware that he had been shot multiple times and

was severely bleeding.  Therefore, he was an identifiable victim, subject to imminent harm of further degradation of his condition and eventual death if he was not provided prompt medical care.  It was also apparent that forcibly removing Carter, a severely injured man, from the vehicle could subject him to imminent harm.  Cooper has introduced evidence that the officers detained him, which prevented him from going to the hospital in Wilson's vehicle, and delayed in calling for an ambulance.  It would be apparent to the officers that these actions would delay his access to necessary medical care, therefore subjecting Carter to imminent harm.  This is not a case challenging a broad series of actions with far-reaching consequences for multiple persons over an extended period of time.  Rather, the alleged harm impacted an identifiable victim whose freedom of action was restrained by the defendant police officers, occurring "within a framework limited in duration, place and condition," Tryon v. North Branford, 58 Conn. App. 702, 710 (2000).  Accordingly, defendant police officers are not entitled to summary judgment on the question of immunity as to these claims.

     1.  City

   Under Connecticut law, a municipality can be held liable for the negligent act or omission of a municipal officer acting within the scope of his or her employment.  Conn. Gen. Stat. § 52-557n(a)(1).  "General Statutes § 52-557n(a)(2)(B), however, explicitly shields a municipality from liability for damages to person or property caused by the 'negligent acts or omissions which require the exercise of judgment or discretion as an official function of the authority expressly or impliedly granted by law.'"  Petersen, 279 Conn. at 614 (quoting Conn. Gen. Stat. § 52-557n(a)(2)(B)).  As the court has already noted, the defendants' police officers' actions clearly fall into the category of

discretionary governmental acts, so the municipality is immune for the acts or omissions of the officers unless an exception applies.

In 2006, in <u>Doe v. Petersen</u>, the Connecticut Supreme Court applied the identifiable person/imminent harm exception to a municipality.  279 Conn. at 609, 614-16.  While the earlier case of <u>Pane v. Danbury</u>, 267 Conn. 669, 677-78 n.9 (2004), had explained in a footnote that the exception did not apply to municipalities, this court will follow the later case of <u>Doe v. Petersen</u> in concluding that the imminent harm exception applies to municipalities.  <u>See</u> <u>Petersen</u>, 279 Conn. at 609, 614-16; <u>see also</u> <u>Seri</u>, 573 F. Supp. 2d at 672-73 ("Since the <u>Petersen</u> decision, the prevailing opinion of the lower courts in Connecticut appears to be in favor of applying the identifiable victim/imminent harm exception to municipal immunity, too." (citations omitted)); <u>Susman v. Town of East Haven</u>, No. CV020468497, 2007 WL 1532713, at *5 (Conn. Super. Ct. May 9, 2007) (concluding that the "imminent harm exception" applies to municipalities).

The court has already concluded that the exception applies to the actions of the defendant police officers in this case.  Because the officers were acting within the scope of their employment, the analysis as to whether the municipality is entitled to the exception for Cooper's wrongful death claims in Count Three is identical to the analysis already conducted as to the immunity of the defendant police officers.  Accordingly, the City is not entitled to summary judgment on the question of immunity as to Cooper's wrongful death claim.

     E.    <u>Causation</u>

In order to prevail in his claims against the defendant police officers, Cooper must demonstrate that Carter's death resulted from their actions.  That is, he must

establish that the defendant police officers' actions were a cause in fact and proximate cause of Carter's death.  Cause in fact, also known as "but-for cause," asks whether the injury would have occurred were it not for the defendant's conduct.  Proximate cause asks whether the defendants can legally be held liable for the results of their conduct.

Defendants in section 1983 actions, like tort defendants, are responsible for the "'natural consequences of their actions.'"  Higazy v. Templeton, 505 F.3d 161, 175 (2d Cir. 2007) (quoting Monroe v. Pape, 365 U.S. 167, 187 (1961)).  "[I]n all § 1983 cases, the plaintiff must prove that the defendant's action was a proximate cause of the plaintiff's injury."  Gierlinger v. Gleason, 160 F.3d 858, 872 (2d Cir. 1998) (citations omitted).  Although a lack of evidence of proximate causation may lead to the granting of summary judgment, the Second Circuit has emphasized that "foreseeability and causation . . . are issues generally and more suitably entrusted to fact finder adjudication."  Higazy, 505 F.3d at 175 (citations and internal quotation marks omitted).

Under Connecticut law, to determine proximate cause, the court inquires into "whether the defendant's conduct is a substantial factor in bringing about the plaintiff's injuries."  Paige v. Saint Andrew's Roman Catholic Church Corp., 250 Conn. 14, 25 (1999) (citations and internal quotation marks omitted).  The court must inquire into "whether the harm which occurred was of the same general nature as the foreseeable risk created by the defendant's negligence."  Artie's Auto Body, Inc. v. Hartford Fire Ins. Co., 287 Conn. 208, 218 (2008) (citations and internal quotation marks omitted).  As an early case explained,

> Whether an injury following a negligent act is caused by this act depends upon whether it is traceable in causal relation to the tortious act.  Or, expressed in another form, was this act a substantial factor in causing this later injury?  There

54

may be several injuries resulting from the negligent act which are not necessarily simultaneous, but the act to have such a continuing effect must be a substantial factor in producing each injury.  Whether they are concurrent, successive, or intervening is of no consequence in determining the causal relation of the injury to the tortious act; all that is of consequence is: Were they substantial factors in producing the injury?

Mahoney v. Beatman, 110 Conn. 184, 197-98 (1929).  To establish proximate

causation, Cooper need not prove that the defendant police officers' actions were the

sole cause of Carter's death; instead, he need only demonstrate that their actions were

a substantial factor in producing Carter's death.

Cooper has created an issue of fact as to whether the defendant police officers

were a cause in fact of Carter's death.  Cooper has submitted an expert report of a

physician, Dr. Peter Paganussi, in which Dr. Paganussi opines that, "Mr. Carter was

deprived of an opportunity for successful treatment by the Defendants' actions in

causing delay in his treatment. . . . This delay . . . . necessitated an emergency

thoracotomy and dramatically increased the mortality in this situation."  Paganussi Rep.

This report is sufficient to create an issue of fact as to factual causation—that is,

whether Carter would have died had the defendant police officers not acted.

As to proximate causation, the court first turns to the question of whether the

"lost chance" doctrine applies.  The defendant contends, at least as to the state law

claims, that the "loss chance of recovery doctrine" sets forth the requirements of

establishing causation, and that plaintiff cannot meet these requirements because he

has not provided evidence that Carter had a 51 percent or greater chance of survival.

The plaintiff counters that the doctrine is only applicable in medical malpractice cases,

and that causation should be determined according by the court inquiring whether the

defendants' acts or omissions were a substantial factor in bringing about Carter's death.

Connecticut courts apply the "lost chance" or "lost opportunity" doctrine in medical malpractice cases where a plaintiff claims that a physician's negligence decreased the plaintiff's chance of survival or successful treatment.  See Boone v. William W. Backus Hosp., 272 Conn. 551, 573-74 (2005).  In such a situation, the doctrine limits recovery to cases where the plaintiff can show that prior to the physician's alleged negligence, the plaintiff had a chance of survival of at least 51 percent, and that the resulting decreased chance more likely than not resulted from the physician's negligence.  Id.

For several reasons, the court concludes that the Connecticut Supreme Court would not apply the loss of chance doctrine's causation formula to limit the ability of Cooper to recover on the facts of this case, and would instead apply the "substantial factor" test.  First, the court is not persuaded that the doctrine should be extended beyond the peculiar circumstances of medical malpractice.  As the Massachusetts Supreme Judicial Court recently pointed out in adopting the loss of chance doctrine for the first time in a medical malpractice wrongful death action, "[p]ermitting recovery for loss of chance is particularly appropriate in the area of medical negligence." Matsuyama v. Birnbaum, 452 Mass. 1, 3 (2008); see also Restatement (Third) of Torts: Liability for Physical Harm § 26 cmt. n (Proposed Final Draft No. 1, 2005) ("To date, the courts that have accepted lost opportunity as cognizable harm have almost universally limited its recognition to medical-malpractice cases.").  Second, and more fundamentally, the doctrine's purpose is to provide an alternate theory of recovery in medical malpractice claims where ordinary theories of recovery would not be available;

56

it does not serve as a limit on the ability of an aggrieved plaintiff to recover under ordinary causation principles.  See id.; see also Borkowski v. Sacheti, 43 Conn. App. 294, 301-08 (1996) (discussing the various versions of the doctrine and the relaxed theory of causation that it embodies).  Therefore, since plaintiff specifically disclaims reliance on the doctrine, the court will not consider it further.

The court must therefore determine whether Cooper has created an issue of fact as to whether Carter's death was a natural consequence of the defendant police officers' actions (federal claims) and whether the defendant police officers' actions were a substantial factor in Carter's death (state claims).  As discussed, Dr. Paganussi has opined that "Mr. Carter was deprived of an opportunity for successful treatment by the Defendants' actions in causing delay in his treatment. . . . This delay . . . . necessitated an emergency thoracotomy and dramatically increased the mortality in this situation." Paganussi Rep.  Carter's medical records suggest that his condition rapidly deteriorated over a short period of time upon his reaching the hospital, and Wilson's Affidavit states that Carter became less lucid during his detention by the defendant police officers. Further, because the defendant police officers were aware that Carter had been shot and was severely injured, it was foreseeable to them that restraining him would delay his ability to access medical care and could result in his death.  The court concludes that a rational jury could conclude from this evidence that Carter's death was a natural and foreseeable consequence of the officers' actions in detaining Carter, and that the officers' actions, and the resulting delay in Carter's ability to access medical care, were a substantial factor in causing Carter's death.  Therefore, Cooper has created an issue of fact as to proximate cause on both federal and state claims.

57

**IV.     CONCLUSION**

For the foregoing reasons, defendants' Joint Motion for Summary Judgment (Doc. No. 50) is GRANTED IN PART and DENIED IN PART.  Summary judgment is granted as to the following claims: as to Count One, the court grants the defendant police officers summary judgment on Cooper's Fourth Amendment claim that there was no reasonable suspicion to stop the vehicle (on qualified immunity grounds), on Cooper's Fourth Amendment claim that there was no justification to remove Carter from the vehicle (on qualified immunity grounds), on Cooper's Fourteenth Amendment claim that the seizure unreasonably delayed Carter's ability to get medical treatment, and on Cooper's Fourteenth Amendment claim that the defendants' refusal to transport Carter in a police cruiser unreasonably delayed Carter's ability to get medical treatment.  As to Count One, the court grants the City of Hartford summary judgment on Cooper's failure to train claim and Cooper's claim that the City's practice and custom of transporting gravely injured individuals by police cruiser was unconstitutional.  As to Count Two, the court grants the defendant police officers summary judgment on Cooper's claim that they had no reasonable suspicion to stop the vehicle (on state immunity grounds) and his claim that they unconstitutionally refused to transport Carter in a police cruiser to the hospital.  As to Count Two, the court grants the City of Hartford summary judgment on Cooper's failure to train claim and Cooper's claim that the City's practice and custom of transporting gravely injured individuals by police cruiser was unconstitutional.  As to Count Seven (indemnification), the court grants the City of Hartford summary judgment as to all underlying claims as to which the court has granted summary judgment because there is no genuine issue of material fact.

58

Summary judgment is denied as to the following claims: as to Count One, the court denies summary judgment to defendant police officers as to Cooper's Fourth Amendment claim that Carter was unconstitutionally subjected to prolonged detention, as to Cooper's Fourth Amendment claim that excessive force was used in removing Carter from the vehicle, and as to Cooper's Fourteenth Amendment claim that defendant police officers unconstitutionally delayed calling for an ambulance.  As to Count Two, the court denies summary judgment to defendant police officers as to Cooper's claim that Carter was unconstitutionally removed from the vehicle, that Carter was unconstitutionally subjected to prolonged detention, that excessive force was used in removing Carter from the vehicle, and that defendant police officers unconstitutionally delayed calling for an ambulance.  As to Count Three, the court denies summary judgment to defendant police officers and the City of Hartford on Cooper's wrongful death claims.  As to Count Four, the court denies summary judgment to defendant police officers on Cooper's negligent infliction of emotional distress claim.  As to Count Seven (indemnification), the court denies summary judgment to the City of Hartford as to all underlying claims as to which the court has denied summary judgment because there is a genuine issue of material fact.

**SO ORDERED.**

Dated this 21st day of July, 2009, at Bridgeport, Connecticut.


 /s/ Janet C. Hall                                
Janet C. Hall
United States District Judge

59